BRYANT *v.* EDGMON.

4-4105

Opinion delivered January 20, 1936.

*J. H. Brock, G. O. Patterson* and *J. F. Loughborough,* for appellants.

*Ben E. McFerrin, A. J. Russell, Jr.,* and *C. A. Fuller,* for appellees.

McHANEY, J. Appellant, J. M. Bryant, is the father of the other two appellants, Leslie E. and Charles H. Bryant. They are engaged in the stave business as partners under the firm name of J. M. Bryant & Sons Company. They operate a mill at Clarksville where they reside, and also have mills at other places. At the time of the occurrence of the matters in this controversy, they were engaged in the business of manufacturing, and buying on the market, staves for beer kegs and barrels.

Early in 1933, appellee Edwards had cruised the white oak timber on a tract of land in Newton County, containing 1,806 acres, property of the Himmelberger-Harrison Lumber Company of Cape Girardeau, Missouri, for a Mr. Sparks who was contemplating buying the white oak timber thereon at a price made by the owner of $10 per acre. Appellee Edgmon was interested in the sale to Sparks as he thought he might get to work it when it was cut. Sparks declined to purchase because he was unable to finance the proposition. Thereupon appellees undertook to interest appellants in the purchase of the white oak timber. They went to see appellants at their Clarksville office, talked to Leslie Bryant and his father who said they were not interested in the timber, but they

called in Charlie Bryant and he stated that he would like to look at the timber before they turned it down, which he did. Appellees say that in the conversation with the appellants at that time, they proposed that appellants purchase the timber and that they would work it, and the profits would be divided between appellants and appellees on a fifty-fifty basis, that is, according to Edgmon, that he and Edwards would manufacture the finished timber into beer staves. Appellants deny that any such discussion took place regarding the manufacture of the timber into beer staves on a basis of the division of the profits or any other basis. The conversation between the parties regarding the purchase of the white oak timber on said tract occurred a short time prior to February 7, 1933.

After Charlie Bryant had looked at the timber, or a portion of it, for a part of two days, Mr. Sarff, agent for the owner, and appellee Edgmon, went to Clarksville and further negotiations were had with appellants regarding the purchase of the white oak timber. Edwards was not present on this occasion, and it is not contended by appellees that anything was said at this time between the parties regarding the working of the timber by appellees on a profit-sharing basis, except that J. M. and Leslie Bryant both testified that on that occasion Leslie told appellee Edgmon that, if they did purchase the timber, there would be no moral obligation to Edgmon. This was denied by Edgmon. Sarff and appellants could not agree on the time in which the timber was to be removed from the land, he limiting this time to three years, and they asking for seven, and no agreement was reached, and appellee Edgmon went home. Sarff, Leslie and Charlie Bryant drove to the home office of the owner to see if an agreement could be reached regarding the time to remove the timber, with the result that no trade was made for the purchase of the white oak timber, but they did make a trade in which appellants bought the land and all the timber for a consideration of $21,000, and a deed was taken in the name of Leslie E. Bryant on February 7, 1933.

Shortly before March 2, 1933, and nearly thirty days after the purchase of the 1,806-acre tract by appellants, appellees called on appellants at Clarksville and entered into an agreement with them by the terms of which appellees were to sell to appellants all beer staves that appellees made in the next 12 months, at agreed prices. This agreement was reduced to writing on March 2, and signed by Leslie Bryant for appellants and M. L. Edgmon for appellees. This contract did not relate in any way to the cutting of timber on the 1,806-acre tract, and nothing was said at that time by the parties regarding the right of appellees to work the timber on the 1,806-acre tract. After working under this written agreement for several months, it was terminated by mutual consent in the latter part of October, 1933, and a settlement was had between the parties dated November 2, 1933. Appellee Edgmon complained to appellants that he and Edwards had lost money in the performance of the written contract and were unable to pay appellants what was due them. In the settlement, J. M. Bryant voluntarily allowed them increases over the contract price for staves which, together with other increases allowed during the time the contract was being performed, amounted to $6,362.31. After these allowances, the account still showed that appellees were indebted to appellants in the sum of $2,119.13, which Edgmon said they were unable to pay, and Mr. Bryant told him they would cancel it, which was done. In addition to this he gave appellees four mules, two wagons and harness. During this settlement nothing whatever was said by Edgmon or any one else regarding the claim in this litigation.

On October 13, 1933, appellants sold the said 1,806-acre tract of land to the Motor Wheel Corporation for approximately $38,000, which latter company employed Edgmon to cut the white oak timber on said tract into bourbon bolts, which work was completed in the summer of 1934.

On December 27, 1933, this suit was instituted by appellees against appellants in which they alleged that they had entered into a partnership arrangement with appellants on a profit-sharing basis to work the white

oak timber on said tract of land as above stated and prayed judgment in a large sum as being one-half the profits they would have made had they been permitted to cut the timber and that appellants breached the contract by selling the land.

On a trial of the case, the court found that there was a partnership agreement between the parties regarding the purchase of the land and the manufacture and sale of the white oak timber on it, and gave judgment against appellants for one-half the profits which the court determined would have been made from the manufacture and sale of the timber in the sum of $23,-597. This appeal is from that judgment.

It is first contended by appellants for a reversal of the judgment against them, that the finding of the court that there was a contract between the parties as claimed by appellees, is against the preponderance of the evidence. The rule in this court in determining where the preponderance of the evidence lies in chancery cases has been many times stated, but in none of our cases is there a better statement of the rule than that by Judge Wood in *Leach* v. *Smith,* 130 Ark. 465, 197 S. W. 1160. After stating the rule in law cases, it is said: "But in chancery causes the procedure is entirely different. When chancery causes reach this court on appeal, they are taken up for trial *de novo* on the record made up in the lower court, that is, on the same record, but the law and the facts are examined the same as if there had been no decision at *nisi prius.* In determining the issues of fact by this court in chancery causes, no weight is given to findings of fact by the trial court unless the evidence is so conflicting as to leave the minds of this court in doubt as to where the preponderance lies. Where the evidence is evenly poised, or so nearly so that we are unable to determine in whose favor the preponderance lies, then the findings of fact by the chancellor are persuasive. But the issues of fact, as well as law, are tried by this court anew."

Bearing this well-settled rule in mind, as well as also the rule that the burden of proof is upon the appellees to establish all the material allegations of their complaint

by a preponderance of the evidence, we are of the opinion that the finding of the trial court that there was a contract between the parties as contended by appellees is against the clear preponderance of the evidence. It will be remembered that Edwards did not cruise the timber with any view of selling same to appellants, but, on the contrary, he was employed by Sparks and paid by him to do so. Edgmon hoped that if Sparks bought the timber he would get to work it if and when Sparks was ready to do so. When this sale fell through, they both went to appellants to interest them in buying it. They testified that on that occasion they proposed to appellants that if they would buy the white oak timber, they, appellees, would work it into finished beer staves and the profits be divided between appellants and appellees equally. And this in substance is all that they claim was said at that time or afterwards on the subject, and that this proposition was made at a time when the three appellants were present at their office in Clarksville. Appellants, and each of them, deny positively that any such arrangement was mentioned or discussed. Furthermore, both J. M. and Leslie Bryant testified that, when the agent Sarff came to see them about the purchase of the timber with Edgmon, Edwards not being present, Leslie Bryant called Edgmon to one side, while they were out looking at the mill and told him, in the presence of his father, J. M. Bryant, that if they did buy the timber, there would be no moral obligation to Edgmon in the transaction, and that Edgmon agreed. This was denied by Edgmon. Leslie Bryant said that he told Edgmon that, because he and Edwards had come over and talked to them about the tract of timber and that they didn't want any one to feel that they were obligated in any way, "as it is our policy to pay as we go." Sarff did not hear the conversation and did not recall the incident. A witness for appellant, Mr. Phipps, testified that Charlie Bryant told him in January or February of 1933 that appellants had bought the land, and that Edgmon would work it for one-half the profits. He also testified that J. M. Bryant told him in August, 1933, that Edgmon was working the land, and that ap-

pellants were splitting the profits with him. At that time no timber was being worked on said land. Another witness said that Charlie Bryant told him in February, 1933, that if they closed the deal, Edgmon would have all the timber he ever wanted to saw-mill. The testimony of these witnesses in this regard was contradicted by appellants, they stating that they had no such conversation, and the testimony of J. M. Bryant denying that he made the statement that Phipps attributed to him was corroborated by Earnest Deskin and Mrs. L. J. Deskin, who said they heard the conversation between Mr. Bryant and Mr. Phipps, and nothing was said about Edgmon. Another witness, Jack Smith, for appellants, testified that, in a conversation with Edgmon regarding the cutting of the timber on the 1,806-acre tract, Edgmon told him that he did not have any contract on that tract, but, if Bryant worked it, he guessed he would work it. This was denied by Edgmon. In addition to the testimony of the witnesses as above set out, there are several cogent facts and circumstances which are undisputed, and it is proper to take the attendant circumstances into consideration in determining the correctness of the findings of fact made by the chancellor. *Lewis* v. *Brown*, 145 Ark. 492, 224 S. W. 986. It will be remembered that appellants bought the land on February 7, 1933, and it is undisputed that appellees knew of it immediately. A few days before March 2, appellees entered into negotiations with appellants for the cutting of staves which resulted in the written contract dated March 2, 1933. In that contract, appellees agreed to make and deliver to appellants' yards, "such beer staves as you make during the next twelve months." It was not contemplated that any of the staves to be manufactured under that contract were to come from the 1,806-acre tract of land, but from other lands. So it was not possible for appellees to have worked the 1,806-acre tract under the contract claimed by them for a period of twelve months because they had contracted in writing for all of their output for that period of time at prices stated in said contract. Furthermore, it does not seem reasonable that appellants would enter into an oral contract with the appellees for

the manufacture of staves from such a large tract of land owned by appellants, when they were very careful to put another and smaller contract in writing. The substance of the oral agreement as testified to by appellees has been stated. It will be noticed that nothing was said in it about how appellees were to be financed, who would furnish the money for them to operate on, or who would furnish the mill, machinery and appliances with which to cut the timber and manufacture the staves. In addition at the time of the settlement heretofore mentioned, under the contract of March 2, apparently a complete settlement was had between the parties, and it is not contended by appellees that they made any mention of the claim they now make against appellants.

In view of these facts and circumstances, we are of the opinion that appellees are mistaken in contending that they had any enforceable contract with appellants regarding the 1,806-acre tract. They may have mentioned to appellants that they would like to cut the white oak timber and manufacture it into staves for them, and they may have had the hope that they would be permitted to do so, because of their friendly relationship with appellants during many years, and because they brought the matter of the purchase of this tract to the attention of the appellants. We are of the opinion, however, that no contract was ever entered into between the parties,—that there was no meeting of the minds upon any definite and enforceable contract.

We are therefore of the opinion that the findings of the trial court were against the preponderance of the evidence, and the judgment must be reversed and the cause dismissed.

HUMPHREYS, J., dissents.